**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Federal Trade Commission,** | ) | **CASE NO. 1:26 CV 2615** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **Digital Forensics Corp. LLC, et al.,** | ) | |
| | ) | **Memorandum Opinion and Order** |
| | ) | |
| **Defendants.** | ) | |

## INTRODUCTION

This matter is before the Court on plaintiff's request for a preliminary injunction. (Doc. 2.) This is a Federal Trade Commission consumer protection case. For the reasons that follow, plaintiff's request for a preliminary injunction is GRANTED.

## BACKGROUND

Plaintiff the Federal Trade Commission (the "FTC") initiated this case against defendants[1] on October 6, 2026, by filing under seal its Complaint and its Motion for *Ex Parte* Temporary

---

[1] Together the "Defendants" include Digital Forensics Corporation, LLC ("DFC"); 1st All File Data Recovery, LLC ("1st All Data"); 1st All File Recovery USA, Inc. ("1st All File"); I & D Belkin LLC ("I & D"); Remote Backup Corp, LLC ("Remote Backup"); Digital Cyber Forensics Investigations LLC ("Cyber Investigation"); Cyber Digital Forensics Response LLC ("Cyber Response"); 1st All Investments, LLC ("1st All Investments"); Salon Place LLC ("Salon Place"); VPR Academy LLC ("VPR"); 21111 Chagrin Investments LLC ("21111 Chagrin"); 4350

Restraining Order with Asset Freeze and Order To Show Cause Why Preliminary Injunction Should Not Issue ("Motion"). (Doc. 2.) The FTC's Complaint alleges that Defendants' business practices violate several federal consumer protection statutes and rules: namely, Section 5(a) of the FTC Act, 15 U.S.C. § 45(a); the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310; the Gramm-Leach-Bliley Act ("GLB Act"), 15 U.S.C. §§ 6801-6809, 6821-6827; and the FTC's Trade Regulation Rule on the Use of Consumer Reviews and Testimonials ("Reviews and Testimonials Rule"), 16 C.F.R. Part 465.

The FTC alleges that Defendants mislead panicked sextortion victims into purchasing their services. The FTC alleges that these services are either unnecessary and/or not provided as represented. The FTC also alleges that Defendants manipulate their online reputation by flooding platforms with fake or false reviews and fail to honor their own refund policy and/or condition refunds on victims signing non-disclosure agreements and removing past negative reviews.

Based on its review of the materials submitted by the FTC to support these allegations,[2] this Court granted the FTC's Motion for *Ex Parte* Temporary Restraining Order with Asset Freeze on October 7, 2026. In additional to restraining any unlawful business practices and freezing Defendants' assets, the TRO also appointed a receiver ("Receiver"). This Court also ordered Defendants to show

Renaissance LLC ("4350 Renaissance"); and Dmitry Belkin, individually and as an officer for the aforementioned defendants, ("Belkin").

[2] Materials submitted included sworn declarations, including from an FTC investigator and the Vice President of Operations at the Cleveland Better Business Bureau ("Cleveland BBB"), numerous exemplar customer complaints filed with the FTC and the Cleveland BBB, declarations from former customers, and declarations and interview summaries of former employees.

cause why a preliminary injunction should not issue. Defendants filed an opposition ("Opposition") and the FTC filed a reply ("Reply").[3]

## DISCUSSION

In their Opposition, Defendants oppose any preliminary injunction generally, but also specifically ask this Court to dissolve or modify the receivership appointment and vacate the order freezing defendant Belkin's personal assets. This Court will first address why a preliminary injunction is warranted before determining its scope.

### A. The Court Finds That a Preliminary Injunction Is Warranted

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Given this limited purpose, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* Accordingly, a party "is not required to prove his case in full at a preliminary injunction hearing and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Id.* (citation omitted).

When considering a motion for preliminary injunction, a district court must balance four factors:

(1) whether the movant has a strong likelihood of success on the merits;

(2) whether the movant would suffer irreparable injury without the injunction;

---

[3] Defendants also filed a Motion for Leave To File Instanter a Supplemental Bri[e]f in Opposition to Plaintiff's Motion for Order to Show Cause Why Preliminary Injunction Should Not Issue (Doc. 22.) This Court granted Defendants' motion. The FTC filed a response to Defendants' Supplemental Brief and Defendants filed a reply.

(3) whether issuance of the injunction would cause substantial harm to others; and

(4) whether the public interest would be served by the issuance of the injunction.

*Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005).[4]

**1. The FTC Has Shown a Strong Likelihood of Success on the Merits**

To establish a likelihood of success on the merits, "a plaintiff must show more than a mere possibility of success." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997). A plaintiff must "establish[ ] a substantial likelihood or probability of success on the merits." *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 635 (6th Cir. 2010) (quoting *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 888 (6th Cir.2000), *overruled on other grounds by 729, Inc. v. Kenton County Fiscal Court*, 515 F.3d 485 (6th Cir. 2008)). "[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Certified Restoration*, 511 F.3d at 543 (quoting *Six Clinics*, 119 F.3d at 402).

[4] Federal Rule of Civil Procedure 65, which governs the issuance of preliminary injunctions, does not explicitly require the court to conduct an evidentiary hearing before issuing an injunction. Fed. R. Civ. P. 65(a)(1) (requiring only that "[n]o preliminary injunction shall be issued without notice to the adverse party."). Still, this Court acknowledges that Sixth Circuit jurisprudence has interpreted Rule 65 to require an evidentiary hearing when there is a material dispute of facts. *See Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 553 (6th Cir. Dec. 17, 2007). Here, Defendants were given notice and an opportunity to be heard through their Opposition, Supplemental Brief in Opposition, and reply thereto. While Defendants do generally dispute some of the FTC's allegations and evidence, they fail to dispute many of the underlying facts and the bulk of evidence alleged in the FTC's Complaint. Accordingly, as explained in more detail below, this Court finds that there is no material dispute of facts at this point that would necessitate an evidentiary hearing.

Here, the FTC alleges that Defendants have violated several federal consumer protection statutes through Defendants' misrepresentation of their services and their deceptive consumer review practices.

**a. Violations Based on Defendants' Misrepresentation of Their Services**

The FTC alleges that Defendants' misrepresentations of their services violate Section 5(a) of the FTC Act, the TSR, and the GLB Act.

Section 5 of the FTC Act prohibits material misrepresentations or omissions that would likely mislead consumers acting reasonably under the circumstances. *See FTC v. Foreclosure Sols., LLC*, 2008 WL 11380125, at *5 (N.D. Ohio Nov. 21, 2008); 15 U.S.C. § 45(a). "A representation is material if it is likely to affect a consumer's decision to buy a product or service." *FTC v. E.MA. Nationwide, Inc.*, 767 F.3d 611, 631 (6th Cir. 2014) (citing *FTC v. Int'l Computer Concepts, Inc.*, 1995 WL 767810, at *2 (N.D. Ohio Oct. 24, 1995)). "Express claims are presumed to be material" and "consumer reliance on express claims is also presumptively reasonable." *FTC v. Int'l Computer Concepts, Inc.*, 1994 WL 730144, at *12 (N.D. Ohio Oct. 24, 1994).[5]

Similarly, Section 310.3(a)(2)(iii) of the TSR prohibits sellers and telemarketers from "misrepresenting, directly or by implication, any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer." 16 C.F.R. §§ 310.3(a)(2)(iii). Moreover, Section 310.3(a)(4) prohibits sellers and telemarketers from making any false or misleading statements to induce a person to pay for goods or services. 16 C.F.R. § 310.3(a)(4).

[5] In their Opposition, Defendants contend that this Court must weigh the considerations in 15 U.S.C. § 45(n). But Section 45(n) applies to "unfair" practices under Section 45(a). The FTC clarifies that it alleges only "deceptive" practices under Section 45(a).

Further, Section 521(a)(2) of the GLB Act bars the use of false or fraudulent statements to acquire a consumer's banking information. Specifically, the act prohibits "any person" from "obtain[ing] or attempt[ing] to obtain . . . customer information of a financial institution relating to another person . . . by making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution." 15 U.S.C. § 6821(a)(2). "[C]ustomer information of a financial institution" refers to "information maintained by or for a financial institution which is derived from the relationship between the financial institution" and its customer that is "identified with the customer." 15 U.S.C. § 6827(2).

According to the FTC's allegations, Defendants expressly represent during their initial sales calls that their "Phase 1" services include Defendants: (1) taking over communications with the sextortionist, (2) tracing the sextortionist's location through a "tracking campaign," (3) producing a detailed investigative report, (4) sending a cease-and-desist letter to the sextortionist, (5) reporting the sextortionist to law enforcement, and (6) stopping the sextortion attack. Thereafter, Defendants expressly represent that their "Phase 2" services include reporting the sextortionist to law enforcement and "monitoring" to detect and intervene in any renewed sextortion attack. Importantly, Defendants do not dispute that these are the services they represent to consumers as being provided in Phase 1 and Phase 2.[6] (*See* Doc. 18, at 5–6 (summarizing their Phase 1 and Phase 2 services).)

---

[6] Defendants do seem to claim Phase 1 services only include the "threat" of reporting a sextoritonist to law enforcement, but a review of the undercover call transcript and the call script provided by Defendants illustrates that Defendants represent they "will' send information "to the police department in the criminal's jurisdiction" during Phase 1. (Doc. 2-12, at 23:16–21; Doc. 18-1, at 31.) This conforms with the understanding lodged in several consumer complaints too. (*E.g.*, Doc. 2-42 ¶ 6 (consumer declaration); Doc. 2-6, at 13, 27 (exemplar consumer complaints).) But, as

Materials submitted by the FTC illustrates that Defendants represent to consumers that they have a "90% success rate" when referring to their Phase 1 services. (Doc. 2-12, at 22:19–25:14 (explaining Phase 1 services to the undercover FTC investigator and representing that the information Defendants' purportedly collect is why Defendants "have a 90% success rate . . . because these criminals are not going to risk for us to expose them to everyone"). The FTC alleges that, in reality, Defendants rarely perform any of Phase 1 or Phase 2's represented services.

In response, Defendants generally deny any wrongdoing but fail to specifically deny most of the FTC's key allegations. For example, in their Supplemental Brief, Defendants allude to their "90% success rate" claim,[7] but the same materials evince that they fall well short of that mark as to at least three of Phase 1's represented services: tracking, sending cease and desist letters, and submitting information to law enforcement. Specifically, Defendants concede that they were only able to successfully "track" the extortionist's location in 70.1% of their sample cases. (Doc. 22-1, at 2.) Even further, Defendants concede that they were only able to obtain "identification information concerning

---

explained next, whether Phase 1 includes sending a report to law enforcement or only the threat, Defendants' own evidence evinces they failed to provide this service.

[7] This Court understands from Defendants' briefing that they would cast a "success" as simply preventing the release of customers' sensitive materials. (Doc. 18-1 ¶ 16 ("A case is considered a 'success' when, through DFC's efforts, sextortionist do not release the explicit materials and stop harassing the client.".) But this is not how Defendants represented their services and "goals" to consumers in the materials submitted, including materials Defendants submitted. (Doc. 18-1, at 32 ("The main goal of Phase 1 is simple: make the blackmailer stop by putting enough pressure on them that they have to make a choice, risk everything, or move on."); Doc. 2-12, at 25:14-16 (expressly representing the same on a sales call to an undercover FTC investigator).)

This Court also notes that elsewhere Defendants declare it is their "goal" to obtain "Proof of Deletion." (Doc. 18-1, Ex. A ¶ 31(g). By Defendants' own submission, they only obtained proof of deletion in 18.8% of their sampled cases.

suspected perpetrators or associated individuals" in 32.9% of their sample cases. (*Id.*) This identification information is obviously a precursor to sending a genuine cease-and-desist letter to the sextortionist and reporting the sextortionist to law enforcement. It follows then that in almost 70% of the sample cases, Defendants failed to provide more than one of their core represented services.

Additionally, this Court understands that part of the FTC's theory is that Defendants misrepresent the necessity of their services. If a sextortion victim contacts law enforcement, they are advised to block and ignore the sextortionist. (*E.g.*, Doc. 2-42 ¶ 13 (consumer declaration) ("The FBI agent recommended that I block the sextortionist and ignore the threats, because sextortionists will move on to their next target once they realize I was not going to pay.").) Defendants represent to consumers that this method is ineffective and the breadth of their specialized services is necessary to prevent dissemination. (*Id.* ("This was very different advice than what BlackmailHelpline told me, which was that I should take the sextortionists threats seriously because sextortionists follow through with their threats."); Doc. 18-1 ¶ 19 ("DFC recommends that the client *not* block or ignore sextortionists[.]"). In reality, however, Defendants oftentimes merely block the sextortionist without initiating any contact or attempting any tracking campaign, which a consumer could do on their own for free. (*E.g.*, Doc. 2-6, at 6, 8, 19 (example consumer complaints); Doc. 2-15 ¶ 6 (summary of interview with former employee).) For this reason, showing only that consumers' sensitive materials were not disseminated is not evidence that rebuts Defendants' alleged misrepresentations to consumers about the necessity and breadth of their services.

Based on this alone, this Court could find that the FTC has shown a strong likelihood of success on its claims that Defendants violated Section 5(a) of the FTC Act, the TSR, and the GLB Act through their misrepresentations to consumers about their services. But there is even more

uncontroverted evidence before this Court that weighs in favor of issuing a preliminary injunction. For example, the FTC represents that between February 1, 2023, and September 28, 2026, it has received complaints from 847 different consumers concerning Defendants' services. Many of these consumers complain that the represented services were not provided,[8] including complaints that—as mentioned above—Defendants merely block the sextortionist without initiating contact or attempting a tracking campaign (*e.g.*, Doc. 2-6, at 6, 8, 19 (example consumer complaints) and Defendants failed to obtain any identifying information, (*e.g.*, Doc. 2-4, at 18, Doc. 2-5, at 11 (exemplar consumer complaints)). While Defendants contend they addressed the "lion's share" of these complaints, they do not contend that these complaints are categorically false.[9]

The FTC also provides declarations with information from former employees, claiming, among other things that Defendants failed to provide the services represented to clients, including contacting law enforcement authorities. (*E.g.*, Doc. 2-27 ¶ (former employee declaration); Doc. 2-13

---

[8] The FTC notes that many of these complaints mention the same few employees. (Doc. 2-3 ¶ 12.) Defendants submit declarations from other employees denying their personal involvement in the alleged conduct, but Defendants do not address the allegations against these specific employees or provide any declarations from them. Further, Defendants provide a sworn declaration from one Jacquelyne Diab who represents that she is the Chief Operating Officer of DFC and "oversee[s] the quality assurance and complaint departments to ensure that all departments are adhering to company policies, procedures, and standards, and employees that fail to meet these standards are identified, re-trained or otherwise provided the proper resources to remediate their performances and, if performance does not improve, ultimately terminated." (Doc. 18-4 ¶ 5.) She further alleges that she is "personally aware" of the processes Defendants use to ensure employees are following procedures. (*Id.* ¶¶ 6–11.) She proceeds to recall very specific information about Mark Tolok, a former employee who submitted a declaration to the FTC, but she offers no similar information about any of the employees repeatedly named in customer complaints, who she claims to oversee.

[9] This Court notes that Defendants believe sextortionists file many of the negative reviews. (Doc. 18, at 15.) To ensure the Court is not relying on reviews with disputed origins, this Court only cites complaints where Defendants' response to the complaint suggests a bona fide customer.

¶ 11 (summary of interview with former employee).) Notably, while Defendants attempt to attack the credibility of these employees, they do not contend that these particular statements are false.

This is perhaps not surprising because, in their Reply, the FTC represents that "during the FTC's immediate access of Defendants' office building, FTC staff discovered a document in the mail room reading: 'Sextortion letters: Letter from analysts that need to be sent out NOTE: if the letter need to be sent to Nigeria or Philippines they never receive them.'" (Doc. 19, at 10.) Defendants do not refute or even address this in their Supplemental Brief or reply thereto. But, as the FTC aptly points out, this suggests Defendants did not contact the authorities in a significant number of their cases because Defendants' themselves state that "most sextortionists reside in foreign countries, such as Nigeria and the Philippines." (Doc. 18-3 ¶ 14(f).)

Taken together, the Courts finds that the FTC has shown a strong likelihood of succeeding on the merits of their claims that Defendants violated Section 5(a) of the FTC Act, the TSR, and the GLB Act through their misrepresentations to consumers about their services.

**b. Violations Based on Defendants' Deceptive Consumer Review Practices**

The FTC alleges that Defendants' deceptive consumer review practices violate Section 5(a) of the FTC Act and the Reviews and Testimonials Rule.

As summarized above, Section 5(a) of the FTC Act prohibits material misrepresentations or omissions that would likely mislead consumers acting reasonably under the circumstances. 15 U.S.C. § 45(a). Similarly, the Reviews and Testimonials Rule prohibits a business from writing or creating a consumer review that materially misrepresents, expressly or by implication, that the reviewer exists. 16 C.F.R. § 465.2(a)(l). The Reviews and Testimonials Rule also prohibits a business from purchasing a consumer review about the business or one of the services it sells, which the business

knew or should have known materially misrepresented, expressly or by implication, that the reviewer exists, 16 C.F.R. § 465.2(b)(l), or that the reviewer used or had experience with the product, service, or business that is the subject of the review, 16 C.F.R. § 465.2(b)(2).

The FTC alleges that Defendants engaged in deceptive consumer review practices in three ways: (1) writing or creating fake or false consumer reviews; (2) purchasing fake consumer reviews; and (3) coercing customers into writing a positive review that did not reflect the customers' experiences, views, or opinions.

Here too, Defendants generally deny any wrongdoing but fail to seriously refute the bulk of the FTC's allegations in support of their claims. For example, the FTC points to a consumer alert warning issued by the Cleveland BBB for DFC related to inauthentic reviews. The alert stated that "In June 2024, it came to BBB's attention that Digital Forensics Corp. is requesting individuals to remove reviews as a condition of resolving concerns described in the reviews. In light of the questions that this practice raises regarding the authenticity of reviews, BBB has removed reviews posted during the time periods in which BBB believes this practice to have occurred. In addition, BBB has been unable to confirm the authenticity of numerous positive submitted for this business. Because BBB is unable to establish a reasonable degree of confidence about the validity of these reviews, BBB has removed reviews that we were unable to confirm." (Doc. 2-3 ¶ 13(g)(ii).) The Vice President of Operations at the Cleveland BBB also submitted a declaration attesting to the specifics of these alerts. (Doc. 2-25 ¶¶ 27–49.)

Defendants do not dispute the existence or substance of this warning. Notably, they do not dispute the existence and execution of confidentiality agreements and releases with consumers. The

veracity of the FTC's allegations concerning Defendants' conditions refunds are further supported by consumer complaints (*e.g.*, Doc. 2-4, at 18–31 (exemplar consumer complaints).)

As for the FTC's allegations related to Defendants writing or creating fake or false consumer reviews and purchasing fake consumer reviews, Defendants generally deny these allegations but say nothing of the hundreds of complaints flagged by the Cleveland BBB as likely inauthentic.[10]

Taken together, the Courts finds that the FTC has shown a strong likelihood of succeeding on the merits of their claims that Defendants' violated Section 5(a) of the FTC Act and the Reviews and Testimonials Rule through their deceptive consumer review practices.

**2. The FTC Has Shown the Likelihood of Irreparable Injury Without the Injunction**

Defendants acknowledge that there is a "presumption of irreparable harm based on a statutory violation." (Doc. 18, at 16 (quoting *City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 120 (2d Cir. 2010)).) But Defendants contend that the FTC's allegations alone are insufficient to form this presumption. For all the reasons addressed above, the FTC's allegations do suggest there is a strong likelihood that Defendants have violated several federal consumer protection statutes and, thus, the presumption of irreparable harm is appropriate here.

Defendants further contend that "[t]he FTC does not cite any compelling evidence that shows [Defendants'] approach to combatting sextortion crimes exacerbated a victim's situation." (Doc. 18, at 16.) Contrarily, the FTC points to customer reviews and declarations saying exactly that. (*E.g.*, Doc. 2-7, at 25 ("[DFC] also said if the person did send [my photos], they would be alerted and it be taken down in seconds . . . . I paid an extraordinary amount of money for them to take over

---

[10] These FTC's allegations are also supported by the statements of a former employee. (Doc. 2-15 ¶ 12.) Here too, Defendants fail to specifically refute this evidence.

communications with this individual, and in less than one hour after them taking over communications, the individual began leaking the information. I called the analyst immediately asking what is happening, he had no idea this occurred. I had to send him screenshots of all the instances, as he could not find these posts. All he did was ask which accounts these were and . . . and literally the only thing they did was request to block the account. . . . I would have been better off dealing with this myself."); Doc. 2-4, at 13 (describing how Defendants' involvement "just made [the blackmailer laugh] and maybe even painted a larger target on my back."); Doc. 2-48 ¶ 11 ("DFC made things worse.").)

For all the reasons mentioned here and in the analysis above, this Court finds there is a strong likelihood that misled consumers will not only face monetary losses in the absence of a preliminary injunction (which, this Court notes, exacerbates their situation),[11] but that they will also face irreparable nonmonetary harm caused by relying on Defendants' misrepresentations to combat their sextortion.[12] Accordingly, the FTC has shown that there is a likelihood of irreparable harm without an injunction.[13]

---

[11] This is especially true given the evidence that Defendants merely block sextortionists after receiving customers' payments—something customers could do themselves for free.

[12] Both parties acknowledge that victims of sextortion often experience heightened feelings of stress, vulnerability, and desperation. Defendants even purportedly train their employees on handling consumers who indicate an intention to self-harm. Defendants' misrepresentations about their service and ability to help these consumers may only exacerbate these feelings when their true services and capabilities are revealed.

[13] The FTC also alleges that "concealment and dissipation of assets likely obtained through fraud constitutes irreparable harm[.]" *McGirr v. Rehme*, 891 F.3d 603, 613-14 (6th Cir. 2018). Because this Court finds there is a likelihood of irreparable harm to vulnerable consumers, it need not reach this alternative basis.

### 3. The Preliminary Injunction Will Not Substantially Harm Others and Will Serve the Public Interest

Defendants contend that the issuance of a preliminary injunction will substantially harm them and others because Defendants will not be able to help current customers and operate their businesses. As this Court will reiterate in more detail below, nothing in its preliminary injunction order will prevent Defendants from continuing any legitimate business operations. Defendants do not contend any other way a preliminary injunction would substantially harm them or others.

Further, because there is a likelihood of irreparable injury without an injunction and no substantial harm to others with an injunction, the public interest is served by the issuance of an injunction ensuring the enforcement of federal consumer protection laws. *FTC v. Mallett*, 818 F. Supp. 2d 142, 149 (D.D.C. 2011) ("The public interest in ensuring the enforcement of federal consumer protection laws is strong.").

For all the aforementioned reasons, this Court finds that all four factors weigh in favor of issuing a preliminary injunction here.

## B. The Scope of the Preliminary Injunction

Having determined that the issuance of a preliminary injunction is warranted, the Court turns to determining the scope of the injunction. The FTC asks this Court to adopt the TRO in its entirety. Having duly considered the FTC's request and Defendants' opposition, this Court converts the TRO into a preliminary injunction with the following modifications.

### 1. Business Operations

Section I of the TRO prohibits Defendants from:

> A. Misrepresenting or assisting others in misrepresenting, expressly or by implication, any material fact, including, but not limited to that:
>
> 1. Defendants will stop a sextortion attack;

2. Defendants will communicate with sextortionists on behalf of the customer;

3. Defendants will conduct a "tracking campaign" that will obtain accurate details on the sextortionist, including the sextortionist's identity and location;

4. Defendants will provide a customer with a report containing truthful information collected about the sextortionist;

5. Defendants will report a sextortionist's illegal activities to law enforcement;

6. Defendants will monitor the customer's accounts and the Internet to detect and intervene in any renewed sextortion attack;

7. Defendants will provide the customer with a refund if it is requested within the time period set out in Defendants' contracts;

8. Positive consumer reviews of Defendants' services are truthful reviews by actual customers; and

9. Any other fact material to consumers concerning any good or service, such as: the total costs; any material restrictions, limitations, or conditions; or any material aspect of its performance, efficacy, nature, or central characteristics.

B. Writing or creating a consumer review that materially misrepresents, expressly or by implication, that the reviewer exists or that the reviewer used or otherwise had experience with Defendants' goods or services;

C. Purchasing a consumer review about Defendants or one of the goods or services Defendants sell, which Defendants knew or should have known materially misrepresented, expressly or by implication, that the reviewer exists or that the reviewer used or otherwise had experience with Defendants' goods or services; and

D. Making false, fictitious, or fraudulent statements or representations to customers of financial institutions to obtain or attempt to obtain customer information of a financial institution of those customers.

(Doc. 8, at 7–8.)

Defendants contend this language somehow prevents them from operating their legitimate business enterprises, including businesses beyond its advertised sextortionist services. But Section I only prohibits Defendants from engaging in illegitimate and unlawful business practices. Still, to the extent necessary, this Court clarifies that nothing in Section I of the preliminary injunction shall be construed to prohibit Defendants from continuing any legitimate business operations. To the extent Defendants cannot operate their business(es) without violating Section I of the preliminary injunction, they should not be operating at all.

**2. Receivership**

Sections XI–XVI of the TRO govern the appointment and role of the Receiver. Federal Rule of Civil Procedure 66 permits a district court to appoint a receiver in accordance "with the historical practice in federal courts or with a local rule." A "district court enjoys broad equitable powers to appoint a receiver over assets disputed in litigation before the court." *Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006). "The receiver's role, and the district court's purpose in the appointment, is to safeguard the disputed assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of the assets if necessary." *Id.* "A receivership is an 'extraordinary remedy' that a court should employ with the 'utmost caution' and grant 'only in cases of clear necessity to protect plaintiff's interests in the property.'" *Pension Ben. Guar. Corp. v. Evans Tempcon, Inc.*, 630 F. App'x 410, 414 (6th Cir. 2015) (quoting 12 Wright & Miller's Federal Practice & Procedure § 2983 (3d ed.)).

District courts in the Sixth Circuit have considered the following factors when determining whether the appoint a receiver:

> (1) the adequacy of the security; (2) the financial position of the borrower; (3) any fraudulent conduct on the defendant's part; (4) imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; (5) inadequacy of legal remedies; (6) the probability that harm to the plaintiff by denial of appointment would outweigh injury to parties opposing appointment; (7) the plaintiff's probable success in the action and the possibility of irreparable injury to the plaintiff's interest in the property; and (8) whether the plaintiff's interests sought to be protected will in fact be well-served by a receivership.

*PNC Bank, Nat'l Ass'n v. Goyette Mech. Co.*, 15 F. Supp. 3d 754, 758 (E.D. Mich. 2014).

In opposing the continued appointment of the Receiver, Defendants do not seriously contend that this Court lacked a legitimate basis for appointing the Receiver. Instead, Defendants' opposition to the appointed Receiver is that the appointment somehow prevents Defendants from continuing legitimate business operations and services. Although already noted above, this Court clarifies that nothing in its preliminary injunction order shall in any way prevent Defendants and their employees from continuing legitimate business operations.

Defendants also argue that any previously compelling justification for this Court's appointment of the Receiver to prevent any absconding of funds is no longer warranted because the appointed Receiver "has taken control of Defendants' bank accounts and made thorough copies of their computer databases and business records." (Doc. 18, at 21.) Defendants contend that it is therefore "no longer possible for Defendants to abscond with funds or destroy relevant evidence." (*Id.*)

In its Reply, the FTC declares that Defendants have not provided any of the TRO's required financial disclosures or taken steps to comply with the TRO's command to repatriate foreign assets. (Doc. 19, at 4, 12.) Notably, Defendants did not provide any rationale for this failure in either their Opposition, Supplemental Brief in Opposition or reply thereto.

Defendants' failure to provide full financial disclosures and take steps to repatriate their foreign assets is concerning and, if anything, underscores the necessity of a Receiver. Accordingly, at this time, the Receivership shall remain in effect. This Court is open to a future motion to modify this aspect of the preliminary injunction if, and when, complete financial disclosures are made by all Defendants and steps are taken to repatriate foreign assets.

**3. Freeze of Defendant Belkin's Personal Assets**

Sections III and IV of the TRO direct a freeze of Defendants' assets, including defendant Belkin's individual assets.[14] Belkin contends that his personal assets are not properly subject to a freeze because (1) the FTC has not identified any statute that authorizes freeze of an individual's personal assets to secure a prospective money judgment and (2) the TRO's freeze failed to comply with Rule 65.[15]

First, Section 19 of the FTC Act authorizes the FTC to seek "the refund of money" to address violations of certain rules, including the TSR, GLB Act, and Reviews and Testimonials Rule. 15 U.S.C. § 57b(a)(1), (b). Several federal courts have held that Section 19 allows asset freezes to

---

[14] The TRO, and now the preliminary injunction, directs a freeze of the other Defendants' assets as well. Defendants do not raise any specific arguments against those freezes.

[15] Alternatively, Belkin contends that a freeze of his assets amounts to a prejudgment attachment, which is not recognized by applicable law. As the FTC notes, a court in this district has previously considered and rejected the argument that an asset freeze constitutes a pre-judgment attachment. *FTC v. 6253547 Canada, Inc.*, 2009 WL 10714993, at *2 (N.D. Ohio June 2, 2009) (quoting *F.T.C. v. H.N. Singer, Inc.*, 668 F.2d 1107, 1112 (9th Cir. 1982)) ("While it is true that the asset freeze has an effect comparable to that of an attachment, it is not an attachment."). Accordingly, the court in *6253547 Canada* concluded "the FTC may seek to freeze a Defendants' assets under . . . 15 U.S.C. § 53(b) without complying with Rule 64 and the attendant state-law attachment requirements." Defendants do not address this holding from *6253547 Canada*. Having reviewed *6253547 Canada*, this Court finds its reasoning persuasive and adopts it here.

preserve the possibility of future redress for violations of these rules. *FTC v. Elegant Sols., Inc.*, 2022 WL 2072735, at *2–3 (9th Cir. June 9, 2022); *FTC v. Simple Health Plans LLC*, 58 F.4th 1322, 1329 (11th Cir. 2023) (upholding Section 19 asset freeze); *FTC v. ACRO Services LLC*, 2022 WL 17177641, at *2 n.2, 4 (M.D. Tenn. Nov. 21, 2022) (granting Section 19 asset freeze). Although not controlling, the Court finds these decisions to be persuasive. Further, Belkin does not cite any federal court that has held otherwise.

Second, the FTC's uncontroverted evidence satisfies Rule 65 and the related case law. As Defendants concede, the asset freeze is warranted under Sixth Circuit case law if the defendant "has a history of disposing of evidence or violating court orders." *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 650–51 (6th Cir. 1993). This Court need look no further than its own TRO to find Belkin has a history of violating court orders. The FTC represents that Belkin has violated the TRO by failing to timely produce any financial disclosures. Belkin has not provided any defense or explanation for this concerning failure.

Additionally, the FTC points to evidence that Defendants move proceeds overseas and comingle assets. Belkin contends these actions are limited to the corporate Defendants. But because there is evidence that the assets of the Defendants (both the corporate entities and Belkin individually) are comingled, it is difficult to separate corporate and personal assets at this point. Importantly, Belkin does not dispute the existence of commingling between the corporate and individual accounts. (*See* Doc. 18, at 25.)

Defendants also contend that Belkin's individual assets are improperly frozen because the FTC has not shown that Belkin may be personally liable for any eventual monetary relief. Defendants acknowledge that in the Sixth Circuit, "an individual's liability for monetary relief requires a showing

that he participated directly in the deceptive practices and had authority to control them, that he knew or should have known of them, and that consumers relied on them to their detriment." (Doc. 18, at 26 (citing *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 636 (6th Cir. 2014).)

Here, the FTC has submitted evidence that Belkin owns all the corporate Defendants. Belkin does not dispute this. There is also evidence that Belkin is the signatory on practically all of Defendants' financial accounts. Again, Belkin does not dispute this.

The FTC also points to evidence that Belkin oversaw Defendants' sextortionist services operations and that he was the "mastermind" behind the sales tactics and the deceptive consumer review practices. While generally denying that he ordered any unlawful activities, Belkin does not deny his active participation and control in these parts of the businesses. Nor does he name anyone else who had the role of, for example, drafting the sales call scripts. (*See* Doc. 18-1 ¶ 24 ("I was involved in and oversaw the script-writing process.").)

While this Court is satisfied that the FTC has established that Belkin's personal assets are legally and factually subject to a freeze, this Court will entertain a request for a reasonable monthly allowance for Belkin's living expenses during the pendency of this litigation. The Court notes, however, that it will not entertain any such request unless and until Belkin makes the financial disclosures required by the TRO. Belkin must also submit documentation that substantiates the requested amount for a reasonable monthly allowance. Additionally, this Court is open to future motions to further modify the preliminary injunction as it pertains to Belkin's personal assets as discovery proceeds and the extent of potential monetary liability is refined.

**CONCLUSION**

For all the aforementioned reasons, this Court GRANTS the FTC's request for a preliminary injunction. The TRO (Doc. No. 8) is hereby converted into a preliminary injunction, subject to the limitations outlined in this Memorandum Opinion and Order.

IT IS SO ORDERED.

PATRICIA A. GAUGHAN
United States District Judge

Date: 10/21/2026